Good morning, Your Honor. May it please the Court. Michael Bostrom on behalf of the City of Los Angeles. I'd like to reserve two minutes of my time for rebuttal, please. The main issue in this case is whether the First Amendment's unfettered discretion doctrine, which requires narrow, objective, and definite standards for licensing discretion, also requires narrow, objective, and definite standards for legislative discretion. The District Court held that it does. Since the District Court's decision, we've had two additional court cases come down that support the City's position that it does not. The first case is the Seventh Circuit decision in Choose Life, Illinois. The issue was squarely presented with the Court, and the Court said that the First Amendment does not require a legislative body to, and in fact, a legislative body cannot adopt standards to control its legislative discretion. It is axiomatic that one legislature cannot bind a future legislature. In addition to that case, in this circuit, we had the Metro Lights decision against the City of Los Angeles come down earlier in the year. Now, while that case did not specifically address an unfettered discretion challenge, it did address a commercial speech challenge in the First Amendment context, dealing with the very ban on off-site signs that is before you today. In that decision, the Court said that the courts will defer to a legislative determination as to what parts of a city a ban will apply and not apply. We take it from that that if the courts will defer to the legislative discretion, that the City may exercise that discretion. But here, the district court's ruling effectively prevents the City from exercising that discretion in the first instance. We believe on these basis that the district court's decision is not tenable. But stepping back even before these two new cases, we think that it was well established even before the district court made its decision that the unfettered discretion doctrine does not apply to legislative discretion. The City of Lakewood case is the seminal case on that point. And it does address licensing discretion. And it says that when we have an ordinance that gives licensing discretion, then that licensing law must bind the licensing official with narrow objective and definite standards. The Court actually talks about the difference between licensing laws and bans. The dissent had argued, well, first stepping back in that case, at issue was whether or not a city could say we're going to completely, we're not going to allow any news racks at all unless the mayor gives his approval as to those news racks. And the mayor had absolutely no standards by which his discretion was cabined. And the dissent said, well, if the city can completely ban news racks, then certainly the mayor can be given discretion to choose where it shall allow them and where it shall not allow them. The majority said no. When we're dealing with bans, we're dealing with a completely different animal than we are when we're dealing with licensing laws. Bans are subject to time, place, and manner. Licensing laws are subject to the unfettered discretion challenge. And so for that reason, we think that the law was very clear. Additionally, the plaintiffs in this case have pointed to this Court's decision in Long Beach Area Peace Network v. City of Long Beach suggesting that that case holds that the unfettered discretion applies to legislative discretion. That case was very clear that it was making a clear demarcation between when a legislative body reserves for itself some licensing discretion within a law that it creates, that it must give itself standards by which it exercises its discretion. However, it made very clear that that was not a holding it was making with respect to the initial legislative decision to adopt or not adopt a law in the first instance. And here, what we have is the City has adopted a ban of off-site and supergraphic signs. The exceptions that the Court found unconstitutional merely state that at some future date, the City may find that in some geographic locations that the City may adopt a new law restricting the geographic reach of the ban, so that it doesn't apply in certain areas. Isn't that true regardless of whether that appears in the law or not? Absolutely, Your Honor. So why is it in the law? It's to create federal cases. It didn't need to be. It didn't need to be. And it was – I think it's a policy statement. It was a policy statement by the City Council that had existed at that time that said, basically, we think in the future that the City Council should proceed in this manner by specific plan or by supplement use district. It didn't require – it couldn't require future legislators to act in that way. Future City Councils could completely ignore the policy directive. But it was just a policy directive. And there's no question about it. The final decision-maker is the City Council? For the law – for adopting the law, correct. And it is for each of the three exceptions? Well, the first one we're talking about is a specific plan. That is a law that reduces the geographic scope. The second one is a supplemental use district. Similarly, it's a law that applies to a certain geographic area in the city. The third exception that the court found unconstitutional is a development agreement exception. What a development agreement is, it's a mechanism that the state – California state law has recognized that allows developers to get some certainty over their projects. They don't want to change the law on the developers once they've committed a lot of resources and developed their projects, only to find that, gotcha, you didn't get your permit, the law changed on you, now you can't do what you were planning to do after you spent millions and millions of dollars. So the development agreement exception says, if you already had a development agreement under the existing law at the time it was entered, then you get to proceed with your development notwithstanding any new laws. But it's not a mechanism to give exceptions to any current laws. So any future development agreements – I'm sorry? Any future development agreements would not provide an exception to, for instance, the ban on freeway signs? They couldn't. And, in fact, the purpose of this development agreement exception was for any development agreement – development agreements that existed before the ban was adopted, because under California state law, under the city of Tuolumne decision and others preceding it, it says you cannot give exceptions to – So, again, you didn't need that in the ordinance. And it didn't need it in the ordinance. No, it was under state law. So, again, the city council, when they adopted the ordinance, it was saying things it didn't need to say. It wasn't giving itself any power that it didn't already have under California state law. When was this adopted? Which? The ordinance. The ordinance, 2002. Do you want to know who was city attorney? Yes, indeed. But moving on from that, Your Honor, the second claim that we have in this case is a central Hudson challenge to the city's freeway-facing – ban on freeway-facing signs that are off-site signs. If the Court agrees with us that the bans on off-site and super graphic signs were constitutional, then there's no reason to reach the central Hudson challenge because under this Court's precedent, under – excuse me – get outdoors 2, there would be no standing to raise that sort of challenge because plaintiff's signs, which are off-site and super graphic signs, would be banned under independently enforceable provisions, and therefore they would not have standing to challenge the freeway-facing sign ban. Well, suppose they want to put signs near the freeway. Wouldn't they have standing? No, Your Honor, because even if the freeway-facing sign ban did not exist, the ban on off-site and super graphic signs would prohibit those signs. So there would be no relief that either the District Court or this Court could grant to them that would be meaningful. So the off-site signs would ban all freeway signs? There are no freeway signs that could be erected that would be on-site signs? Well, how it works, Your Honor, is the off-site ban itself, or the freeway ban itself, it really only applies to commercial signs and commercial signs that are off-site signs. So in many respects, it's sort of duplicative of the ban on off-site signs. So if someone came to the city and they said, look, I want to put up an off-site sign that can be viewed or that will be viewed primarily from the freeway, then if you review all of the city's regulations, the city would say you're banned both by the ban on off-site signs, but even if that didn't exist, you'd still be banned on the freeway-facing ban. So, again, this is something that was totally unnecessary, the freeway ordinance? Well, basically, I think what it does, Your Honor, is the city, the freeway-facing ban is older than the off-site ban. It existed prior to 2002. So when the city adopted this new ban in 2002, rather than completely start from scratch, the city has a tendency, for better or worse, to kind of add on regulations and so kind of creates additional layers of regulation to some extent, which may be duplicative of prior regulations. But the new regulations they were adding when they adopted the ban on off-site signs is more expansive because it applies not only when you're near freeways, but everywhere in the city, unless in the future a specific plan is adopted. So getting back to my point, though, if the court does find that the ban on off-site and supergraphic signs is constitutional, those bans would prohibit their signs, even if they are viewed primarily from the freeway. Thus, they would have no standing to challenge the ban on freeway-facing signs. But even if this court did find that the city's bans were unconstitutional, the city submits that the exceptions that the city has granted to its freeway-facing sign ban are not unconstitutional under the central Hudson test. And we believe that the court's recent decision in the Metrolights case demonstrates that. In the Metrolights case, the court said, you know, when we're dealing with the central Hudson under-inclusivity challenge, which is essentially what the plaintiffs are arguing here, that the city's regulation is under-inclusive because they've granted too many exceptions to the ban, the court has said that there are basically two tests that we use for under-inclusivity. First, we look to see if it's unconstitutional. There are two different arguments they're making here, as I understand it. One is the same arguments they made with the first one, the three general exceptions. And the second is the specific exceptions, like the Santa Monica Transit District exception or the Santa Monica Boulevard exception. And the other is the Staples Center exception. Correct. Actually, as I understand it, Your Honor, I don't think that they're saying that the mere presence of the statutory, of any statutory exceptions undermines the freeway-facing ban. In fact, they did originally bring a facial challenge to the freeway-facing ban. The district court dismissed that claim on the city's motion, and they have not appealed that ruling. What their argument is, is that the actual exceptions, the as-applied exceptions for the Staples Center and the signs along the 15th Street SUD, that those signs render the ban constitutionally under- unconstitutionally under-inclusive. And the – this Court in Metrolites said that an under-inclusivity challenge succeeds only if the exceptions ensure that the regulation will fail to achieve its ends. And we submit that in a city of 400 square miles, two locations where freeway-facing signs are demonstrated does not prevent the city's ban from working. The city's ban still prevents signs everywhere else in the city along the freeways. The second manner in which this Court has recognized that an under-inclusivity challenge may succeed is if the exceptions make distinctions among different kinds of speech that have no relationship whatsoever to the interests that the government has asserted. And here, the city's interests for the ban are both traffic safety and aesthetics. And the record demonstrates that the exceptions for both the Staples Center and the 15th Street SUD bear a significant relationship to the city's interests in traffic safety and aesthetics. Taking the Staples Center first, the record demonstrates that this was a blighted area that was filled with a number of signs. The – the Staples Center ordinance allowed the city to redevelop this blighted area. It also allowed it to reduce the total amount of signs. Before, there were some nine off-site signs existing on the premises. And with the city's exception from the freeway-facing ban, we're left with only two. That furthers the city's interests. Moving to the 15th Street SUD, the record demonstrates that the purpose of this SUD was to relocate existing off-site signs that were on Little and Santa Monica Boulevards. The city determined that it was in the city's traffic safety interest to renovate those areas in order to facilitate the east and west traffic flow between the 405 freeway and Beverly Hills by combining a lot of the roads in this area. In order to do that, it had to remove existing signs. So those signs, which I think were 14 signs, were removed. And rather than force the city to pay eminent domain compensation, two signs were allowed at the 15th Street SUD. So again, we have a reduction in signs, which furthers the city's interest in getting rid of these signs, and it also furthers the city's interest in improving traffic safety. With that, I will conclude and reserve my remaining time. Thank you, Mr. President. Thank you, Carol. Thank you. Good morning. May it please the Court, my name is Rex Heineke. I'm here with my colleague, Mike Small, on behalf of a plaintiff who we've referred to collectively as Worldwide Rush. I'd like to turn to the first issue that Mr. Bostrom raised, because this is central to the city's appeal, this question where they say a city council cannot have discretion that's subject to the well-established doctrine that you cannot give standardless discretion to the government to control speech. And I'd like to go through the arguments the city has raised in that regard. First, the city says that the plaintiffs have suffered no injury here. Well, the plaintiffs have plainly suffered injury. Not only have they been prohibited from putting up signs, they've been subjected to claims for civil penalties, and they've been subjected to criminal prosecution. So there's no doubt that the plaintiffs suffered injury. What the city really seems to be saying is, well, you can't have a facial attack here. They don't say that in so many words, but that really seems to be their position in the end, that you can't have a facial attack because you're attacking the exemptions. But the Supreme Court in the city of Lakewood made it clear that it's the threat that the government will use its power under those exemptions to control speech that allows a facial attack, so that the Supreme Court said the decision-maker in Lakewood. In Lakewood, that was a government official, I believe, the mayor, or maybe it was an administrator, but it was not the city council. It was not the city council. It was not. And here you've got the city council. We certainly have the city council. Is that a massive distinction? It's a distinction. It's huge, isn't it? We do not believe it's huge. And we think that the decision in Long Beach Peace Area answers that question, Your Honor. How? Because there it was the city council, too, that retained the discretion. And the Ninth Circuit held that the unfettered discretion doctrine applied to the Long Beach City Council. There was no administrator there. There was only the city council. And this court applied the unfettered discretion doctrine there. And the city made the same argument there that the city is making here. Long Beach said because we didn't delegate this power to an individual or an administrator or an official of the government, because we retained it ourselves, the unfettered discretion doctrine does not apply to us. And this court in Long Beach Area said, no, that's not the case. Well, it wasn't the ordinary legislative authority, was it? I'm sorry? It was not the ordinary legislative authority. Yeah. They retained the authority to approve or disapprove requests for exemptions from fees for marches. And the city retained to itself, that is, the city council retained the authority to say whether or not it was going to approve that or not. Is that different from making the decision itself? I'm not sure what you mean, the decision. Approving something that somebody else makes and making the decision yourself. That seems to be different. They didn't approve. The city council in Long Beach did not approve the decision of some official of the city. They themselves approved whether or not the fees would have to be paid. The decision is solely up to them. Sorry, I didn't mean to interrupt, but this whole notion of unfettered discretion and the decision-maker comes from the doctrine of prior restraints on speech. Right. And the fear is that the decision-making body will make decisions based on the content of the speech. And so in this Long Beach area case, I think the problem was that what they retained only that discretion as to whether or not they would waive charges or not waive charges for speech that was already approved. And inherent in that was the concern that they would waive or not waive charges based on who was saying what. And that's why, as opposed to a general legislative act, as Judge Trott points out. And I'm really having trouble applying this whole notion of prior restraints on speech to a general ban such as this where there's no ‑‑ they're not making any distinctions based on the content of any of the billboards. They're saying they're almost ‑‑ if you're going to use First Amendment analysis, they're giving time, place and manner determinations as to size and nature and placement of billboards. Right. But under the underfettered discretion doctrine, a plaintiff does not have to show that in fact the government has discriminated on speech. All it has to show is that the government has the power to do so. Doesn't the city council have the power to do that wholly aside from this particular ordinance? I mean, if the exemptions weren't in the ordinance, couldn't they one day come along and pass a special use district? Can't they do that anyway? I mean, can't they say yes? I mean, aren't they allowed under all their planning documents and everything to say, well, we want to encourage development maybe along Grand Avenue where the music center is. And so we're going to allow Broadway‑type signs there and try to attract people to Disney Hall and the music center and various places. Or the opera. Or opera. I mean, couldn't they make that decision in their legislative judgment that that would advance the interests of the city? Yes, they could. But they would have to do it with standards about the signs. And that's the problem here. There's no reason the city has to put these exemptions in the ordinance. Those exemptions in the ordinance have the same effect as standardless discretion given to a government administrator. Why does it change it by putting it in the ordinance if it's already there? Do you agree that the city had that authority? They had special use districts before. They had the development agreements before. They had whatever the third thing is, special districts before. If they didn't put it in the ordinance, everything would just be just the same. Well, but that's also true with a situation of standardless discretion. That is, if you don't put the standardless discretion in the ordinance, the city could always adopt standardless discretion and put it in a licensing scheme. They always have the power to do that. The difficulty is having created those exemptions, they then are saying to speakers, we are going to exercise this power unless you act along the ways that we want you to, in the same way that when you put standardless discretion and give it to an individual official, you have the same problem. No, but they didn't create the discretion here. You said having created that. They didn't create it. It already existed. It's there. And as far as I know, there's nothing wrong with those provisions, that they can create special use districts, special whatever districts, and development agreements. Those powers exist. They didn't create them. They just said you ought to know that these exist and it's subject to these provisions. It's like saying, it seems to me, you know, it's like saying you pass a law and, by the way, you ought to know, it's subject to these other provisions of law. Right, but my point, Your Honor, is that it's also true when a city council, for example, delegates discretion to an individual to, say, approve march permits. That isn't what happened here. There's no licensing scheme in here at all. And the licensing, that's why it's different from Long Beach. And no discretion is given to any official with respect to a licensing scheme. Well, in the first place, I respectfully disagree because what they do is they confer upon themselves this standardless discretion to go here. But beyond that, Your Honor. But that's the question. Are they really conferring upon themselves some discretion they didn't otherwise have or are they merely saying here are the other stat ordinances that exist that may affect you? The city, when it then implemented one of these things, like the specific plan, which they called the L.A. Sports and Entertainment District, which everybody in L.A. calls the Staple Center, as we put in our supplemental excerpts of the record, when the city adopted that, conferred standardless discretion on people for sign. That is, they said either an administrator or something called the Area Planning Commission can approve signs under standards that are standardless, not standards, they're standardless discretion. So that when they implement this, what they do is confer standardless discretion. Well, you're way down the road into a hypothetical then. It's not a hypothetical. They've done it. It's hypothetical with respect to where you're going. Sorry, I don't understand, Your Honor. So your criticism is of the district that they created. You said that they, in creating the district. It's not the district as a district. It's giving within that district standardless discretion to this Area Planning Commission or what they call a director. Well, shouldn't your attack then be on that separate provision? Well, what we did was we, yes, Your Honor, we pointed to that and said, this is an example of how they use this exemption. To show that it's not only they've conferred upon themselves standardless discretion, but when they then use those exemptions, they confer standardless discretion on administrators or this Area Planning Commission. So you're attacking the whole system of having special districts? Not a special district as such, but a special district where the power to approve signs is not subject to clear standards. Are there other special sign districts throughout the city, or is this the only one? No, there are others. As Mr. Bostrom was talking about, there's, for example, this 15th Street Special Use District. No, I know about that one. That's because that's on the freeway thing. But are there other sign districts in the city? Yes, the city may have some other sign districts, but I don't know the details of what those are. We went to these two because they're right there by the freeway. They're both by the freeway. They're these gigantic signs like at the Staples Center, several stories high, digital billboards, which we contend also means that the freeway ban is not effective at all because they're allowing exactly what they say they're trying to prohibit, except they're allowing worse ones, not better ones. They're allowing ones that under any standard, and according to our expert, create more traffic safety hazards rather than less. They didn't reduce the size of these signs. They increased them. They took them also from being what most people would call billboards. That is, they don't have electronic lights and so on. They don't have what's really much like a TV screen, and they don't have the brightness and so on, and they put up these things that the industry calls digital billboards, which are basically TV screens. Well, I guess what I was trying to find out is if there is such a thing, aside from these new ordinances that you're contesting here, which are general ordinances, if they've always had the power to create signed districts, and they have created signed districts, and some of them, one of them or two of them, you feel are standardless, isn't your appropriate remedy to attack those two signed districts? Well, we attack them as well as the general exemptions. Well, I know, but you're attacking the entire ordinance because of the existence of two standardless districts, and what I'm saying isn't your remedy really to attack the two districts, not the entire ordinance. No, but because you represent billboard companies who want to put up more. Well, I don't care what he wants. But it doesn't make any sense to attack the districts. Well, it doesn't make sense. From their perspective. Well, I know, but it might be from their perspective they might like to attack a lot of things, but I'm saying that the freeway or the other one, the offsite, might be legitimate ordinances, and it seems to me it's legitimate to say the city has three other procedures which may provide exceptions to our system. And you say, well, the way the city has administered one of those ordinances, it's created a standardless district. Well, the answer to that is to say, well, we're going to go after that district. That district's wrong, but that doesn't invalidate an entire system throughout the city because one of the three procedures the city already had, they have used in an improper manner in one particular district. I understand your point. We thought we had attacked both those, both the general exemption and the specific application of those exemptions. The district court only ruled on what I'll call the general exemption, that is the three exemptions. It did not reach any of the questions as to individual districts because if the whole thing fell, then there's no reason to reach those. So if the whole thing doesn't fall, you still want to attack and get rid of the special districts? We certainly would. We also have the issue, which I'd like to touch on briefly, which is that the district court said we could not amend to raise a central Hudson challenge to the exemptions. Did you ever ask for relief from that, Ben? Did you ever tender an amended complaint? No, Your Honor, because the district court... Well, then what's the excitement? I mean, you don't even have, you didn't even do it or try to do it. We did not, Your Honor, because the district court expressly told us we could not. So at least you try. Say, we'd like relief from this. Here's the complaint, whatever it is. There's nothing on file. You just walked away from it. Well, we didn't walk away from it. We tried to obey the court's order, Your Honor. Well, usually, you see, even if the judge says, well, I'm not going to let you amend the complaint, you at least tell them what it is you want to do and present a complaint, and then on appeal you can say, here's what they wanted to do. So it's a decent argument. I understand, Your Honor, but what happened was the district court allowed certain amendments. The amended district court said this. The court admonishes plaintiffs, however, that it will not entertain any further amendments, supplements, or changes to their complaint. How long was the amended complaint after the original complaint had been filed? A year. You see, you can't turn these things into degenerative diseases where they go on forever. The court has discretion to say, time out. You know, we have to get this thing over with. The courts are swamped with cases, and they can't let each individual case just run on forever. I understand, Your Honor, but there had been no discovery up to that point. The court found there was no prejudice at that point, but said to us, don't file a complaint. That's why we didn't file an amended complaint, because we weren't going to disobey what was in express order of the court. Well, it's not a disinstitute, not a lack of respect. You say, Your Honor, I appreciate you're not going to do this, but just to preserve our record, here's a complaint we would have filed. You know how to pacify a district judge. Your Honor. As I understand, this seems contrary to the facts. It seems to me that WWR did file a new complaint adding a central Hudson challenge to the freeway facing Sign ban and an unfettered discretion challenge to the super graphic off-site bans, but it didn't add the central Hudson challenge to the super graphic and off-site sign bans. Right. Okay. So why not? I mean, why didn't you add it? You said you were filing a new complaint. Your Honor, I don't know the answer to that. We were not counsel at that time. I don't know why that decision was made. The court had granted a motion to dismiss on certain grounds, and the amendments were directed to try and address those particular grounds. Well, it does seem anyway that if we're going to decide the constitutionality of the city ordinance, it would be helpful for us to be able to deal with all the major legal theories. Right. But if you we still would be dealing with a complaint, and it seems to me there's a way to decide somehow whether it's subject to the constitutional prohibitions or it's not, and I think maybe we'll be able to handle it. Unless the court has any other questions. Thank you for your time. Thank you. Just briefly on the issue of amendments, unless the court has questions on the other. We are asking that the court overturn the district court's decision denying our motion to dismiss those facial challenges to the off-site ban, super graphic ban, et cetera. And we believe that that would essentially take care of the complaint. And while we understand the court's, Justice Reinhart, your notion that it's easier to understand what's going on if you have a full complaint, but there is the notion that these cases do need to come to fruition at some point. And if they believe that there are additional. Well, would you like to have a decision that says, well, it's constitutional except for the Hudson theory, and we'll deal with that in the next case? No. But what we don't want is to have an open-ended where we're going to go back and litigate everything all over again. Well, that's what you might get if you say, well, there are other theories, but they weren't pleaded, so we're not going to resolve them. We'll leave them for the next case. Understood, Your Honor. So I would think it's inextricably intertwined, even though it might not be. Right. I think we can find a way. There's no order to really consider. I don't know. We'll talk about that later. Any other questions? Thank you very much. Thank you. Thank you all very much. We'll now continue with this discussion in the next case, which is Wilshire Center v. City of Los Angeles. Well, I'm here. So let's do this. Wilshire Center. It's whatever it is. It's the next and last case. It must be it. So we're not discussing the contempt issue? That comes in this case. That's in this case? Right.
judges: Reinhardt, Trott, Wardlaw